**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

FRANK JARVIS ATWOOD,
*Petitioner-Appellant*,

v.

CHARLES L. RYAN; GEORGE
HERMAN, Warden, Arizona State
Prison Complex—Eyman,
*Respondents-Appellees.*

No. 14-99002

D.C. No.
4:98-cv-00116-
JCC

OPINION

Appeal from the United States District Court
for the District of Arizona
John C. Coughenour, Senior District Judge, Presiding

Argued and Submitted June 7, 2017
Seattle, Washington

Filed September 13, 2017

Before: M. Margaret McKeown, Consuelo M. Callahan,
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta

## SUMMARY[*]

### Habeas Corpus / Death Penalty

The panel affirmed the district court's denial of a habeas corpus petition in a death penalty case.

The petitioner was convicted after a jury trial and sentenced to death for kidnapping and first-degree felony murder. He claimed that his Eighth Amendment rights were violated by the use of an aggravating circumstance of a prior conviction for another offense for which under Arizona law a sentence of life imprisonment or death was imposable. The petitioner contended that the determination of his eligibility for the death penalty based on this aggravating factor was unconstitutionally arbitrary because Arizona subsequently determined that the conduct underlying his prior conviction for lewd and lascivious conduct under Cal. Penal Code § 288 was not so serious as to warrant a life sentence. The panel held that the Arizona Supreme Court's adjudication of this claim was not contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

The panel held that the state habeas court did not make an unreasonable determination of the facts by failing to hold an evidentiary hearing on a claim of law enforcement misconduct.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the petitioner did not establish ineffective assistance of trial counsel in the failure to develop information regarding the victim's bones, which would have allowed counsel to challenge the State's chronology implicating the petitioner in the murder.

The panel held that the petitioner did not meet the requirements set forth in *Martinez v. Ryan* for overcoming the procedural default of a claim of ineffective assistance of sentencing counsel in the failure to present evidence from mental health experts because he did not show that the failure to raise this claim in state court resulted from ineffective assistance of state habeas counsel. The panel agreed with the district court's conclusion, after an evidentiary hearing, that the claim of ineffective assistance of sentencing counsel lacked merit, and the petitioner therefore failed to establish ineffective assistance of state habeas counsel.

## COUNSEL

Larry A. Hammond (argued), Osborn Maledon P.A., Phoenix, Arizona; Paula K. Harms, Assistant Federal Public Defender; Jon M. Sands, Federal Public Defender; Office of the Federal Public Defender, Phoenix, Arizona; for Petitioner-Appellant.

Lacey Stover Gard (argued), Chief Counsel, Capital Litigation Section; Mark Brnovich, Attorney General; Office of the Attorney General, Tucson, Arizona; for Respondents-Appellees.

**OPINION**

IKUTA, Circuit Judge:

Frank Jarvis Atwood was found guilty of kidnapping and first-degree felony murder and sentenced to death. Atwood appeals the district court's denial of his petition for a writ of habeas corpus. We have jurisdiction under 28 U.S.C. §§ 1291 and 2253, and we affirm.

I

Because the facts as found by the Arizona Supreme Court are presumed correct, 28 U.S.C. § 2254(e)(1), the following background relies on the state court's determination of factual issues.

Before the kidnapping and murder convictions at issue in this case, Frank Jarvis Atwood had been convicted twice for sexual incidents involving children. In 1975, Atwood was convicted of engaging in lewd and lascivious conduct with a child under the age of fourteen years in violation of section 288 of the California Penal Code,[1] *State v. Atwood*, 171 Ariz. 576, 593 (1992) (en banc), and incarcerated at Atascadero State Hospital (a maximum-security facility for convicts

---

[1] At the time, section 288 of the California Penal Code (1975) provided that a person who "wilfully" committed a "lewd or lascivious act" with "a child under the age of fourteen years, with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of such person or of such child" was guilty of a felony punishable by up to life imprisonment. 1937 Cal. Stat. 1562.

deemed to be mentally ill) until his discharge in 1978, i*d. at* 647 n.22.**[2]**

In 1981, Atwood was convicted for kidnapping an eight-year-old boy. *Id.* at 593, 654. Atwood encountered the boy while riding his motorcycle and offered the boy a ride. *Id.* at 655. When the boy refused, Atwood threw the boy's bicycle down and pulled him onto the motorcycle. *Id.* After kidnapping the victim, Atwood forced him to perform oral sex, "holding his head down so roughly that the boy received visible scratches on his neck" and threatening to kill the boy if he screamed. *Id.* Atwood was incarcerated in a California State Penitentiary for this offense. *Id.* at 593.

While in prison, Atwood communicated with Ernest Bernsienne (a member of a religious cult) about his sexual interest in young children. *Id.* at 596, 634 n.17. In one of his letters to Bernsienne, Atwood disclosed that he had been molested when he was fourteen by a twenty-four-year-old man but stated that he "honestly . . . really enjoyed it!" Atwood asserted in the letter that he saw "no reason that sex between [him] and pre-adolescent kids is not only not allowed but also illegal," and admitted that when he was fifteen, he and a friend had taken a four-year-old girl into

---

**[2]** The records from Atwood's incarceration in Atascadero were submitted in connection with his ineffective assistance of sentencing counsel claims. Although the record before the Arizona Supreme Court did not include the facts underlying Atwood's 1975 conviction, *Atwood*, 171 Ariz. at 654 n.24, the Atascadero records and other records submitted to the district court show that Atwood kissed and fondled a ten-year-old girl. According to the Arizona Supreme Court, Atwood "was initially sent to the Atascadero Mental Hospital for an indefinite period of time" but was subsequently resentenced for a definite period of time. *Id.* at 647 n.22.

some bushes to "explain the birds and the bees to [his] young friend, as well as satisfying [Atwood's] sexual curiosity." Atwood was released on parole in May 1984. *Id.* at 593. Bernsienne testified that during a phone call after Atwood's release, Atwood stated that he was considering "going out and picking up a child" and that "this time he would make sure the child wouldn't talk." *Id*. at 596.

After he was released on parole in May 1984, Atwood began traveling across country in his black 1975 Datsun 280Z. *Id.* at 593. In August 1984, Atwood met Jack McDonald, who became his traveling companion. *Id.* Among other stops, Atwood and McDonald visited Bernsienne in Enid, Oklahoma. *Id.* In mid-September, Atwood and McDonald traveled to Tucson, Arizona. *Id.* The morning of September 17, 1984, Atwood was seen at De Anza Park, a congregating spot popular among Tucson's transient population. *Id.* Atwood left the park in the middle of the afternoon. *Id.*

Around the same time, Sam Hall, a teacher at a Tucson elementary school, noticed a "dark Z car" with California license plates in an alley near the school. *Id*. at 592. Hall "described the driver as a man with a medium frame, shoulder-length hair, and a dark beard and mustache," *id.*, a description that fit Atwood at the time, and noted that the man was "making strange gestures and shaking his head," *id.* at 593. Because Hall was "somewhat unnerved by the driver's appearance and behavior, he wrote down the car's license plate number." *Id*.

At around 3:30 p.m., an eight-year-old girl named Vicki Lynn Hoskinson left her Tucson home on a pink bicycle to drop off a card at a nearby mailbox. *Id.* at 592, 595. Two

teenage boys in the neighborhood passed Vicki as she was riding her bicycle south toward the intersection of Root Lane and Pocito Place, which was only a few hundred feet from the elementary school where Hall had observed the "dark Z car" with California license plates. *Id.* at 592–93. The boys also passed a man with "long dark hair, a mustache, and the beginnings of a beard" in a "dark Datsun Z car" heading towards the same intersection. *Id.* (internal quotation marks omitted). When Vicki did not return home, her mother sent Vicki's sister to look for her. *Id.* at 592. Vicki's sister found Vicki's pink bicycle lying in the street near the intersection of Root Lane and Pocito Place, but Vicki was missing. *Id.*

Atwood returned to De Anza Park "approximately one hour before sunset." *Id.* at 593. "As [Atwood's] acquaintances at the park would later testify, he returned with blood on his hands" and a knife. *Id.* at 593, 596. Atwood told his acquaintances that he "stabbed a man in a drug transaction" and "took the body to the desert near the mountains." *Id.* at 596. McDonald testified that Atwood had cactus needles in his arms and legs. *Id.* That evening, after playing pool at a local tavern and returning a tire iron to an acquaintance, Atwood and McDonald left Tucson in Atwood's car for New Orleans, Louisiana. *Id.* at 593. McDonald later testified that he observed Atwood repeatedly sandpapering the blade of his knife during this trip. *Id.* at 599.

On September 18, Hall told the authorities about his observations, including the license plate number of the car. *Id.* at 593. Authorities traced the car to Atwood, *id.*, and agents from the Federal Bureau of Investigation (FBI) contacted his parents for information about his whereabouts,

*id.* at 596. The FBI also obtained a warrant for Atwood's arrest on kidnapping charges. *Id.* at 593.

While driving through Texas, Atwood's Datsun had mechanical problems. *Id.* at 636. Atwood, who was financially dependent on his parents, called his mother for money to pay for the car repairs. *Id.* McDonald heard him say on the phone: "Even if I did do it, you have to help me." *Id.* at 637. McDonald also testified that Atwood told him that law enforcement was "trying to stick something on him about a little girl." *Id.* Atwood's parents informed the FBI that Atwood was taking his car to Ken Stoepel Ford in Kerrville, Texas for repair work. *Id.* at 593.

On September 20, 1984, the FBI arrested Atwood at the garage and impounded his car. *Id.* at 593–94. FBI agents interviewed Atwood in Kerrville for approximately two hours after his arrest. *Id.* at 594. In this preliminary interview, Atwood stated that he and McDonald arrived at De Anza Park around noon on September 17, but that he left the park sometime later after an argument with McDonald. *Id.* Atwood stated that, while he was away from the park, he met Gary Cisco in the area of Wetmore and Romero Roads, an area near Vicki's neighborhood, to discuss buying marijuana and stated that he visited Armour Watts's home. *Id.* Both Cisco and Watts would later deny meeting with Atwood that afternoon. *Id.* Atwood stated that he returned to the park at 5:00 p.m. *Id.*

FBI agents conducted an initial inspection of Atwood's car in Kerrville. *Id.* FBI Agent Declan Hoffman later testified that, as a part of the inspection, he photographed Atwood's car from numerous angles. (This set of photos is referred to as the Kerrville Suite.) At least one photo

included in the Kerrville Suite shows a streak of pink paint on the front bumper of Atwood's Datsun.

The next day, September 21, 1984, the FBI transported Atwood to San Antonio, Texas. *Id.* En route to San Antonio, Atwood changed his story, telling agents that he had returned to De Anza Park at 3:30 p.m. rather than 5:00 p.m. *Id.* The same day, the FBI agents transported Atwood's car to an FBI facility in San Antonio and obtained a search warrant to conduct a more thorough search of the car. *Id.* On September 22, 1984, the FBI agents executed the search warrant and observed pink paint on the front bumper of Atwood's car during this search. FBI Agent Edward Burwitz took scrapings of this pink paint from the front bumper, and FBI Agent Hoffman took additional photos. (This set of photos is referred to as the San Antonio Suite.)

On September 27, 1984, Atwood was charged with kidnapping. *Id.* at 594. Because the investigation was still ongoing at that time, authorities did not know what additional evidence would be found or whether Vicki was still alive. *Id.* This uncertainty changed on April 11, 1985, when the skull and bones of a child were found in the desert northwest of Tucson. *Id.* Through dental records, the Pima County Medical Examiner, Dr. Richard Froede, and a physical anthropologist from the University of Arizona, Dr. Walter Birkby, identified the remains as Vicki's. *Id*. at 594, 598. Both experts noted the presence of adipocere on some of the bones during their evaluation.[3] The State's experts could not, however, determine the cause of death from the bones that were found. *Id.* at 598.

---

[3] Adipocere is a waxy substance that is formed during postmortem decomposition when bacteria breaks down a body's tissue.

Atwood's initial counsel, Lamar Couser, hired two experts, Dr. Philip Keen, the Yavapai County Medical Examiner, and Dr. Hal Chilton, a forensic odontologist, to inspect the remains. *See id.* at 604. Keen and Chilton agreed that the remains were Vicki's. *Id.* Keen's report noted the presence of adipocere and stated that its presence "suggests that at least for some time after death and prior to skeletonization of the remains the body was subjected to a moist environment."

Once both the State and defense experts had the opportunity to inspect Vicki's remains, her family conducted funeral services on May 30, 1985. *Id.* at 604. Soon after Vicki's burial, Atwood's second counsel, Stanton Bloom, replaced Couser. *Id.* Bloom unsuccessfully sought to have Vicki's remains exhumed, arguing that additional testing was needed to determine whether the remains had been correctly identified. *Id.* Records also show that Bloom consulted with two forensic anthropologists, an odontologist, and a dentist regarding the remains.

On May 15, 1985, Atwood was indicted for first-degree murder. *Id.* at 594. The State consolidated the kidnapping and murder charges for trial. *Id.* The Arizona Supreme Court summarized the State's theory at trial as follows:

> Defendant, a convicted pedophile, was cruising [Vicki's] neighborhood in search of a child. He saw [Vicki] riding her bike near the mailbox and followed her on the street as she cut through a field on her way home. The field led to a short street—Pocito—that intersected with Root Lane. Defendant proceeded to Root Lane (where he was seen

by the teenagers), intending to abduct [Vicki] as she traveled down Pocito. [Vicki] stopped briefly to talk with a friend who lived on Pocito, and then continued down the street. Defendant's car struck [Vicki's] bike, leaving a pink paint smear on the car bumper, and he grabbed the child. He then proceeded toward northwest Tucson. En route, his car was sighted by three people, all of whom later identified defendant and testified that they saw a young child in the passenger's seat. Defendant took the child to the desert, where he molested and murdered her. He then returned to De Anza Park in central Tucson, where he had been earlier in the day.

*Id.* at 594–95.

According to the State's witnesses at trial, laboratory tests established that the pink paint on the front bumper of Atwood's car had come "from the victim's bike or from another source exactly like the bike" and that Vicki's bicycle had nickel particles on it that were consistent with nickel on Atwood's bumper. *Id.* at 595. The State's accident reconstruction expert, Paul Larmour, testified that "he found a nearly perfect match heightwise between the contact area on the backside of the bicycle and the [paint] transfer on the bumper," *id.* (alteration in original) (internal quotation marks omitted), and that "marks on the car's gravel pan were consistent with the theory that it struck the bicycle at a low speed and caused the bike to lodge beneath the car," *id.*

After a two-month trial, the jury found Atwood guilty of kidnapping and first-degree felony murder. *Id.* at 591–92.

Before sentencing, the State alleged three capital aggravating factors, and Atwood offered several mitigating circumstances. The court's probation department also prepared a presentence report. At the sentencing hearing, Bloom called two witnesses: Atwood and his father. *Id.* at 651.

After reviewing the evidence presented, the trial court found the aggravating factor set out in section 13-703(F)(1) of the Arizona Revised Statutes had been proven beyond a reasonable doubt. *Id.* at 647–48. At the time of sentencing, this statute provided:

> F. Aggravating circumstances to be considered shall be the following:
>
> 1. The defendant has been convicted of another offense in the United States for which under Arizona law a sentence of life imprisonment or death was imposable.

1985 Ariz. Sess. Laws 1439 (codified at Ariz. Rev. Stat. § 13-703(F)(1)). The trial court held that Atwood's conviction in 1975 for lewd and lascivious conduct under section 288 of the California Penal Code supported the application of this factor because at the time of that conviction, Arizona had a materially identical criminal law providing that a person who commits a lewd or lascivious act with a minor was guilty of a felony punishable by life imprisonment. 1965 Ariz. Sess. Laws 25 (then codified at Ariz. Rev. Stat. § 13-652).[4] The

---

[4] Section 13-652 of the Arizona Revised Statutes stated that "[a] person who wilfully commits . . . any lewd or lascivious act . . . with the intent of arousing, appealing to or gratifying the lust, passion or sexual

trial court found that the mitigating circumstances were not sufficiently substantial to warrant leniency. *Atwood*, 171 Ariz. at 648. Accordingly, the trial court sentenced Atwood to death for the murder conviction and to a concurrent term of life imprisonment for the kidnapping conviction. *Id.* at 591.

On direct appeal, Atwood argued that his 1975 conviction could not be used as an aggravating circumstance under section 13-703(F)(1). Arizona revised its criminal statutes in 1977 to eliminate life imprisonment as a potential punishment for lewd or lascivious conduct with a minor. *See* 1977 Ariz. Sess. Laws 731 (then codified at Ariz. Rev. Stat. § 13-1412). Therefore, Atwood argued that his 1975 conviction was not a crime for which "a sentence of life imprisonment or death was imposable" under Arizona law because "life imprisonment" was not "imposable" at the time of sentencing. *Atwood*, 171 Ariz. at 646–48. Atwood also argued that use of section 13-703(F)(1) violated his Eighth Amendment rights (we refer to this claim as the "Eighth Amendment claim").

The Arizona Supreme Court rejected these claims. It interpreted the language in section 13-703(F)(1) as requiring the defendant to be convicted of an offense for which "a sentence of life imprisonment or death was imposable" under Arizona law at the time the defendant committed the offense, not at the time of the sentencing hearing for the subsequent offense, which could be years or decades later. *Atwood*, 171 Ariz. at 647–48. Applying this interpretation, the

---

desires of either [the actor or victim]," was guilty of a felony punishable by life imprisonment if the victim was "a child under the age of fifteen years." 1965 Ariz. Sess. Laws 25.

Arizona Supreme Court held that section 13-703(F)(1) was applicable to Atwood because a sentence of life imprisonment was imposable in 1974 when he committed the offense of lewd and lascivious conduct.[5]  *Id.* at 648.  The Arizona Supreme Court affirmed Atwood's conviction and sentence, *id.* at 660, and the United States Supreme Court denied certiorari, *Atwood v. Arizona*, 506 U.S. 1084 (1993).

In 1996, Atwood filed his first state habeas petition for post-conviction relief.[6]  Atwood raised his Eighth Amendment claim, as well as two other claims relevant here: (1) a claim that his trial counsel was ineffective for failing to further investigate the presence of adipocere and discover the existence of the grave (we refer to this claim as the "adipocere ineffective assistance of trial counsel claim"), and (2) a claim that law enforcement officials (FBI agents and Pima County Sheriff deputies) engaged in misconduct by planting the pink paint found on the bumper of Atwood's car (we refer to this claim as the "law enforcement misconduct claim").  The Arizona Superior Court denied relief on all claims.  The Arizona Supreme Court denied review, and the United States Supreme Court denied certiorari.

Atwood filed his first habeas petition in federal district court in 1998.  As amended, his habeas petition raised forty-

---

[5] Because Atwood presented his Eighth Amendment claim to the Arizona Supreme Court, which denied relief on the claim without explanation, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011).

[6] Daniel Davis represented Atwood during his state post-conviction proceedings and as second-chair counsel in federal habeas proceedings until February 3, 2012.

three claims, including the law enforcement misconduct claim (Claim 1-B), the adipocere ineffective assistance of trial counsel claim (Claim 2), and the Eighth Amendment claim (Claim 27). He also raised a new claim (Claim 29) alleging ineffective assistance of counsel at sentencing due to the failure to conduct a thorough investigation of Atwood's background (we refer to this claim as the "ineffective assistance of sentencing counsel claim").

On June 6, 2005, the district court dismissed a number of Atwood's claims on procedural grounds. The district court concluded that the ineffective assistance of sentencing counsel claim was procedurally defaulted because Atwood had failed to raise the claim in state court and failed to show cause and prejudice to excuse the default. The court allowed Atwood to file an additional memorandum in support of his remaining claims, and in November 2005, Atwood submitted new photos to support his law enforcement misconduct claim.

In May 2007, the district court addressed Atwood's remaining claims. The district court denied relief for the adipocere ineffective assistance of trial counsel claim and the Eighth Amendment claim, but granted a certificate of appealability on these claims. The district court stayed the proceedings to allow Atwood to exhaust the new aspects of his law enforcement misconduct claim that had not been presented to the state court. The court denied all of Atwood's other claims on the merits and denied a certificate of appealability for these claims.

In December 2007, Atwood filed his second state habeas petition to exhaust the law enforcement misconduct claim, as permitted by the district court. In support of this claim, Atwood produced affidavits from David Hill, a failure analyst

for the aerospace industry who was writing a book on Atwood's case. The Arizona Superior Court held that an evidentiary hearing was unnecessary because Atwood failed to produce evidence sufficient to support a colorable claim of law enforcement misconduct. In reaching this conclusion, the state court determined that Hill's conclusions and opinions were "well outside of any expertise he may have" and therefore did not constitute competent evidence to support Atwood's claim. The state court dismissed Atwood's petition on January 2, 2009. Atwood submitted a motion for rehearing, this time including an affidavit from an additional expert, Dr. Diana Hulick, who approved some of Hill's findings. After considering Hulick's affidavit and re-examining the photos submitted by Atwood, the state court denied the motion for rehearing. Atwood petitioned the Arizona Supreme Court for review.

While Atwood's petition to the Arizona Supreme Court on the law enforcement misconduct claim was pending, the State offered Atwood access to additional discovery. Taking advantage of this offer, Atwood's counsel interviewed Gary Dhaemers, Cliff McCarter, and Leo Duffner, three former Pima County investigators who allegedly engaged in misconduct, as well as the State's accident-reconstruction expert, Paul Larmour. Based on these interviews and additional new materials, Atwood filed a second motion for rehearing with the Arizona Superior Court. But the court again denied the rehearing motion, holding that the new information did not make Atwood's law enforcement misconduct claim any more colorable. The Arizona Supreme Court later denied Atwood's petition for review.

Having exhausted his law enforcement misconduct claim in state court, Atwood returned to federal district court in

January 2012 for a ruling on this claim. The district court permitted additional briefing, ordered the transfer of exhibits from the state court to the federal court, and allowed Atwood's attorneys to make an evidentiary proffer in court. After reviewing the evidence, the district court dismissed Atwood's law enforcement misconduct claim, holding that the state court reasonably concluded that there was insufficient competent evidence supporting Atwood's claim to warrant an evidentiary hearing. At this point, all of Atwood's federal habeas claims had been dismissed.

But a subsequent change in the law revived Atwood's ineffective assistance of sentencing counsel claim. While Atwood's federal habeas petition was pending in district court, the Supreme Court decided *Martinez v. Ryan*, 566 U.S. 1 (2012), which held that under certain circumstances the ineffective assistance of a petitioner's state habeas counsel could constitute cause and prejudice for the procedural default of a claim asserting ineffective assistance of trial counsel.

In light of *Martinez v. Ryan*, the district court permitted Atwood to file a motion for reconsideration of its prior order dismissing Atwood's ineffective assistance of sentencing counsel claim as procedurally barred. Atwood did so. But whereas Atwood's first federal habeas petition had characterized the claim as ineffective assistance for failure to conduct a thorough investigation of Atwood's background, the motion for reconsideration now claimed that sentencing counsel had rendered ineffective assistance by failing to seek mental health experts to evaluate Atwood's mental condition.

In January 2014, after a four-day evidentiary hearing, the district court denied the motion for reconsideration on several grounds. First, the district court concluded that the ineffective assistance of sentencing counsel claim raised in Atwood's motion for reconsideration had not been raised in Atwood's federal habeas petition. It further held that Atwood could not amend his habeas petition to add the new claim under Rule 15 of the Federal Rules of Civil Procedure because the amendment would not relate back to any claim in his habeas petition and therefore would be barred by the one-year statute of limitations set by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), *see* 28 U.S.C. § 2244(d)(1). In the alternative, the district court held that Atwood's revised ineffective assistance of sentencing counsel claim was procedurally barred, because Atwood failed to establish cause and prejudice to excuse his procedural default under *Martinez v. Ryan*. Finally, even if the requirements of *Martinez v. Ryan* were satisfied, the district court held that Atwood's revised ineffective assistance of sentencing counsel claim failed on the merits. The district court did, however, expand its certificate of appealability to include this claim.

Atwood timely filed a notice of appeal, raising the three claims for which the district court granted a certificate of appealability: the adipocere ineffective assistance of trial counsel claim, the ineffective assistance of sentencing counsel claim, and the Eighth Amendment claim. He also raised the law enforcement misconduct claim, and we granted a certificate of appealability.

## II

We review de novo a district court's decision to deny a habeas petition under AEDPA, 28 U.S.C. § 2254. *Aguilar v. Woodford*, 725 F.3d 970, 972 (9th Cir. 2013).[7]

Under 28 U.S.C. § 2254(d), a petition for habeas corpus pending before a federal court "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings" unless the resulting decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," *id.* § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id*. § 2254(d)(2). In conducting this inquiry, we look to the last reasoned state court decision to address the merits of a petitioner's claim. *Gill v. Ayers*, 342 F.3d 911, 917 n.5 (9th Cir. 2003).

Under § 2254(d)(1), "clearly established Federal law" includes only the Supreme Court's decisions in existence "as of the time the state court renders its decision." *Greene v. Fisher*, 565 U.S. 34, 38 (2011) (emphasis omitted) (citation omitted) (internal quotation marks omitted). Accordingly, Supreme Court cases decided after the state court's decision are not "clearly established Federal law" under § 2254(d)(1) for purposes of evaluating whether the state court unreasonably applied such precedent.

---

[7] AEDPA applies to Atwood's federal habeas petition, which was filed after April 24, 1996. *See Lindh v. Murphy*, 521 U.S. 320, 322, 336 (1997).

A state court decision is "contrary to" Supreme Court authority if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). A state court decision is an unreasonable application of clearly established federal law if it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (citation omitted).

A state court "must reasonably apply the rules 'squarely established' by [the Supreme] Court's holdings to the facts" of the case before it. *White v. Woodall*, 134 S. Ct. 1697, 1706 (2014) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)). A rationale that must be extended before it applies is not clearly established law, *Moses v. Payne*, 555 F.3d 742, 754 (9th Cir. 2009), and a state court's refusal to extend a precedent warrants habeas relief "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no fairminded disagreement on the question," *Woodall*, 134 S. Ct. at 1706–07 (citation omitted) (internal quotation marks omitted). "[W]hen a state court may draw a principled distinction between the case before it and Supreme Court caselaw, the law is not clearly established for the state-court case." *Murdoch v. Castro*, 609 F.3d 983, 991 (9th Cir. 2010) (en banc). As the Supreme Court has consistently reminded us, § 2254(d) sets forth a "highly deferential standard . . . , which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citation omitted) (internal quotation marks omitted).

Similarly, under § 2254(d)(2), a federal court "may not second-guess" a state court's factual findings unless "the state court was not merely wrong, but actually unreasonable" in light of the record before it. *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). A state court's determination of facts has been held to be unreasonable under § 2254(d)(2) if "the state-court decision is based on a finding [that] is unsupported by sufficient evidence; the process employed by the state court [wa]s defective; or . . . no finding was made by the state court at all, when it was required to make a finding." *Murray v. Schriro*, 745 F.3d 984, 999 (9th Cir. 2014) (first and second alterations in original) (citation omitted) (internal quotation marks omitted). Further, § 2254(e)(1) states that "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). "[O]ur panel decisions appear to be in a state of confusion as to whether § 2254(d)(2) or (e)(1), or both, applies to AEDPA review of state-court factual findings." *Murray*, 745 F.3d at 1001. However, a court need not address the interaction between § 2254(d)(2) and (e)(1) when the petitioner's claims fail to satisfy either provision. *See id.* (declining to resolve the apparent conflict).

III

First, we address Atwood's argument that the Arizona Supreme Court's adjudication of his Eighth Amendment claim was contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court.

We begin by examining the Supreme Court's death penalty precedent in existence at the time of the Arizona Supreme Court's rejection of Atwood's claim in 1992.

*Greene*, 565 U.S. at 38. Under *Furman v. Georgia*, 408 U.S. 238 (1972), a state's death sentencing scheme is unconstitutional if it provides insufficient guidance to the fact-finder, thereby creating an intolerably high risk of discriminatory and arbitrary imposition of the death penalty. "A fair statement of the consensus expressed by the Court in *Furman* is that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Zant v. Stephens*, 462 U.S. 862, 874 (1983) (citation omitted) (internal quotation marks omitted); *see also Gregg v. Georgia*, 428 U.S. 153, 206 (1976) (plurality opinion) (describing *Furman* as focused on avoiding arbitrary and capricious death sentences by ensuring that sentencing authorities were "directed to give attention to the nature or circumstances of the crime committed or to the character or record of the defendant").

At the time the Arizona Supreme Court ruled on Atwood's Eighth Amendment claim, the clearly established Supreme Court precedent held that in capital cases, the Constitution requires a sentencing body's discretion to be narrowed with respect to two aspects of the process: (1) determining whether a defendant is eligible for the death penalty (the eligibility requirement) and (2) determining whether to impose the death penalty on a particular eligible defendant (the selection requirement). *See Zant*, 462 U.S. at 878–79. A state's death penalty scheme satisfies the eligibility requirement when it directs the sentencing body to find at least one aggravating factor that "genuinely narrow[s] the class of persons eligible for the death penalty." *Id.* at 877. As *Zant* summarized the state of the law, aggravating factors are constitutionally adequate so long as they (1) are not "so

vague that they would fail adequately to channel the sentencing decision," *id.* (quoting *Gregg*, 428 U.S. at 195 n.46 (plurality opinion)), and (2) "reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder," *id.* As for the selection requirement, the Eighth Amendment requires "an individualized determination on the basis of the character of the individual and the circumstances of the crime." *Id.* at 879 (emphasis omitted) (citing, inter alia, *Eddings v. Oklahoma*, 455 U.S. 104, 110–12 (1982) and *Lockett v. Ohio*, 438 U.S. 586, 601–05 (1978) (plurality opinion)). To be constitutionally adequate, a state may not preclude the sentencing body from considering any proffered aspect of the defendant's character or record, or any circumstances of the offense, as a mitigating factor. *Eddings*, 455 U.S. at 110.

Atwood's argument relates to the requirement that the state adequately narrow eligibility for the death penalty. He contends that the determination of his eligibility based on the aggravating factor codified at section 13-703(F)(1) was unconstitutionally arbitrary. According to Atwood, section 13-703(F)(1) was intended to identify a class of the worst offenders who committed the most serious offenses. Because Arizona subsequently determined that the conduct underlying Atwood's prior conviction was not so serious as to warrant a life sentence, Atwood claims that social standards have evolved such that he cannot now be executed on account of prior lewd conduct with a child. In other words, Atwood argues that it would be arbitrary to execute him based on aggravating conduct that society no longer deems to be the worst and that does not reasonably distinguish him from other offenders who had committed prior offenses that did not make them death eligible.

We reject this claim because the Arizona Supreme Court's decision was neither contrary to nor an unreasonable application of clearly established federal law as determined by the Supreme Court. At the time the state court rendered its decision, there was no Supreme Court case invalidating an aggravating factor similar to the section 13-703(F)(1) factor. Nor had the Supreme Court invalidated an aggravating factor relating to a prior conviction because the state had subsequently changed the penalties imposable for such a conviction. (Indeed, the Supreme Court has still not addressed such issues.) Therefore, in rejecting Atwood's claim, the Arizona Supreme Court did not arrive at a conclusion opposite to that reached by the Supreme Court on materially indistinguishable facts.

Nor did the Arizona Supreme Court unreasonably apply clearly established federal law. *Furman* and *Gregg* established a general rule that turns on individualized examinations of death penalty schemes. *See Zant*, 462 U.S. at 875 (citing *Gregg*, 428 U.S. at 195 (plurality opinion)). When applying such general rules, courts have "more leeway . . . in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). Under AEDPA, "a state court [applying a general standard] has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Mirzayance*, 556 U.S. at 123.

Here, the state court could reasonably have concluded that section 13-703(F)(1) meets the requirements set forth in *Furman* and *Gregg* for guiding a sentencing body's decision as to death eligibility. First, the factor is not "so vague" that it fails to narrow the eligibility decision adequately; rather, section 13-703(F)(1) uses a "clear and objective" selection criterion that offers specific guidance. *Godfrey v. Georgia*,

446 U.S. 420, 428 (1980) (plurality opinion). Second, the Arizona Supreme Court could have reasonably concluded that section 13-703(F)(1) is not arbitrary and "reasonably justif[ies] the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant*, 462 U.S. at 877. Contrary to Atwood's claim that Arizona uses section 13-703(F)(1) to identify its worst criminals, a concept that may change over time as society evolves, the Arizona Supreme Court interprets its death penalty statute as having the purpose of determining "the character and propensities of the defendant." *State v. Gretzler*, 135 Ariz. 42, 57 n.2 (1983) (citation omitted) (internal quotation marks omitted). Accordingly, the state court could have reasonably concluded that section 13-703(F)(1) identified an important propensity factor, namely the defendant's willingness to engage in criminal behavior that society deemed at the time to be the most serious, thereby risking life imprisonment or death. *Cf. Jurek v. Texas*, 428 U.S. 262, 272–76 (1976) (plurality opinion) (holding that the sentencer's consideration of whether "the defendant would be a continuing threat to society" does not lead to arbitrary imposition of the death penalty). The Arizona Supreme Court's conclusion that this propensity factor rationally narrows the pool of defendants who are death eligible compared to others found guilty of murder (regardless whether the state later decides to impose only lesser sentences on that offense) is not contrary to or an unreasonable application of the Supreme Court's general guidance in *Furman* and *Gregg.*

IV

We next turn to Atwood's law enforcement misconduct claim. The state habeas court dismissed without an evidentiary hearing Atwood's claim that FBI agents and Pima

County investigators planted pink paint from Vicki's bicycle on the bumper of his car. The state court determined that there was no colorable basis for the claim and that Atwood's theory lacked any "link to provable reality." On appeal, Atwood argues that the state court made an unreasonable determination of the facts, *see* 28 U.S.C. § 2254(d)(2), by failing to hold an evidentiary hearing on this claim.

A state court does not have to "conduct an evidentiary hearing to resolve every disputed factual question." *Hibbler v. Benedetti*, 693 F.3d 1140, 1147 (9th Cir. 2012). The "ultimate question" is whether a state court was "unreasonable in holding that an evidentiary hearing was not necessary in light of the state court record." *Id.* at 1148 (emphasis omitted). We have held that a state court's failure to hold an evidentiary hearing is not unreasonable under § 2254(d)(2) "where the allegations are said to be incredible in light of the record," or where the "petitioner's factual allegations are entirely without credibility." *Perez v. Rosario*, 459 F.3d 943, 950–51 (9th Cir. 2006). Nor does a state court's failure to hold an evidentiary hearing make its factual findings unreasonable "when the record already before the court is said to establish a fact conclusively," or "there is no likelihood that an evidentiary hearing would have affected the determination of the state court." *Id.*

In evaluating whether a state court erred in its fact-finding process, we may look to the rules governing when a district court must conduct an evidentiary hearing, because "if a district court would be within its discretion in denying an evidentiary hearing, a state court's similar decision is probably not objectively unreasonable." *Hibbler*, 693 F.3d at 1148. Nevertheless, our review of a state court's decision not to conduct an evidentiary hearing is much more deferential.

"[W]e may not 'second-guess a state court's fact-finding process' unless we determine 'that the state court was not merely wrong, but actually unreasonable.'"  *Id.* (quoting *Taylor*, 366 F.3d at 999).

In order to determine whether the state court here was objectively unreasonable in failing to conduct an evidentiary hearing, we must first explain Atwood's theory of law enforcement misconduct.  Under Atwood's theory, Pima County investigators, in collusion with the FBI, removed both bumpers from Atwood's car in San Antonio and transported the bumpers as luggage on a commercial airline to Tucson. These investigators then scraped pink paint off Vicki's bicycle (which was in Tucson at the time) and planted it on the front bumper of Atwood's car.  Next, the investigators collected scrapings from the pink paint they had applied to the bumpers, combined these scrapings with scrapings taken by the FBI from an unrelated pink paint smear on the bumper, and substituted the combined sample in the evidence log. The Pima County investigators then used water-soluble paint to cover up the scrape marks created while collecting the sample, transported the bumpers from Tucson back to the FBI's impound garage in San Antonio, and reattached the bumpers to Atwood's car.  Once the bumpers were reattached, the agents took photos of the pink paint on the bumpers and then substituted these photos for original photos in the Kerrville and San Antonio Suites to cover up their actions.

Atwood supports his theory by pointing to alleged anomalies in three different suites of photos (the Kerrville Suite, the San Antonio Suite, and a third suite of undated photos taken in Tucson, which we refer to as the Tucson

Suite), which he claims raise inferences of law enforcement misconduct.

## A

We first consider the alleged anomalies in the Kerrville Suite of photos.[8]

The record establishes that FBI agents conducted an initial inspection of Atwood's car at the garage in Kerrville on September 20, and that FBI Agent Hoffman took photos of the car. Frame 9 of the Kerrville Suite shows pink paint on the passenger side front bumper.

Atwood alleges that Frame 9 was taken in San Antonio (after the FBI tampered with the car to add pink paint from Vicki's bicycle to the bumper, as explained above) and the FBI substituted Frame 9 for the original photo. From this alleged evidence of tampering, Atwood claims, it can be inferred that pink paint from Vicki's bicycle was not present on the bumper of Atwood's Datsun when the FBI took custody of the car in Kerrville.[9]

---

[8] *See* Appendix, pp. 58–61 (select photos from the Kerrville Suite).

[9] Atwood's theory on this point has evolved through the course of the litigation. Initially, Atwood's memorandum submitted in support of his second state habeas petition argued that there was no pink paint on the bumper of his car when he was arrested  Under this theory, Atwood claimed that Agent Burwitz collected paint from the bumper of the car, but it was not pink. According to Atwood's theory at that time, the scrapings entered into the evidence collection log were replaced with later-obtained pink paint scrapings, requiring evidence log entries to be altered. Atwood later conceded that there was pink paint on his bumper at the time of his arrest, but he now claims it was not pink paint from Vicki's bicycle.

Atwood points to the following evidence to support this allegation.  First, Hill made a digital photo enhancement of Frame 9.  Hill claims the enhancement shows that the right side of the front bumper in Frame 9 is "specularly clean and reflective" compared to the left side of the front bumper in Frame 1, which is "grimy, dirty and splattered with dead gnats and other insects."[10]   According to Atwood, the differences in the cleanliness of the bumper establish that Frame 9 was taken at a different time than the rest of the Kerrville Suite.  Second, Atwood submitted an affidavit from Hulick stating that Frame 9 "does not appear to be a part of the same set of photographs" because it is "in sharper focus and taken from a noticeably different angle than the other photographs."   The government gave Atwood sequential negatives of these photos, but Hill stated that "[t]hese images are not 'original negatives' as that term is usually understood."  Instead, according to Hill, "they are negatives made from other negatives or photographic positives." (Hulick did not opine on this issue.)

Based on our review of the record, the state court could have reasonably concluded that Atwood's claim that law enforcement had tampered with the Kerrville Suite was not credible.  First, on their face, the enhanced photos do not show that the right side of the front bumper pictured in Frame 9 is cleaner than the left side of the front bumper pictured in Frame 1.  Moreover, the mere fact that Frame 9 was taken at a different angle than the other Kerrville photos does not raise the inference that it was falsified.  Indeed, the majority of the photos in the Kerrville Suite are taken from differing angles. Atwood presents nothing more than "conclusory allegations"

---

[10] *See* Appendix, p. 61 (comparing Frame 1 and Frame 9 of the Kerrville Suite).

that are "unsupported by facts and refuted by the record," which we have repeatedly held is insufficient to entitle a petitioner to an evidentiary hearing. *Farrow v. United States*, 580 F.2d 1339, 1360–61 (9th Cir. 1978) (en banc).

The state court could also reasonably discount the testimony of Hill and Hulick. The state court's conclusion that Hill's evidence was not competent under Arizona law was not an unreasonable application of Supreme Court precedent nor an unreasonable determination of the facts, given Hill's lack of specialized knowledge. Moreover, Hulick's testimony was merely an inference from the evidence that the court could reasonably reject.

B

Next, we consider Atwood's claim that law enforcement tampered with the San Antonio Suite.

Witnesses for the government provided the following evidence regarding the events in San Antonio. On September 21, 1984, the FBI transported Atwood's car from Kerrville to an FBI impound garage in San Antonio. Two Pima County investigators (McCarter and Dhaemers) flew into San Antonio on a commercial airline the same day. On September 22, FBI Agent Burwitz and four other FBI agents inspected Atwood's car, which had been cordoned off in the FBI's impound garage. FBI agents collected evidence from the car, including scrapings of pink paint from the front bumper. McCarter and Dhaemers were prohibited from touching the car, but observed the FBI activities. The investigations were documented in numerous photos.[11]

---

[11] *See* Appendix, p. 62 (select photos from the San Antonio Suite).

According to Atwood, the photos in the San Antonio Suite showing pink paint on the car's bumper were not taken in San Antonio on September 22. Rather, Atwood alleges that these photos were taken later, after the Pima County investigators fabricated evidence in Tucson, returned the bumpers to the FBI impound garage in San Antonio, and reattached the bumpers.

Atwood supports this theory as follows. First, Atwood states that a "close dimensional analysis" establishes that four of the photos (one of which shows pink paint on Atwood's front bumper) were not taken on September 22 with the other San Antonio photos. Atwood next relies on an affidavit from Hill, which states that one pre-scraping photo from the San Antonio Suite, "when enhanced[,] reveals the existence of scrape marks beneath the surface of the paint." Finally, Atwood points to a photo in the Kerrville Suite that shows a smooth bumper cowling, and a photo in the San Antonio Suite that shows the cowling slightly out of alignment.[12] Hulick states that comparing Exhibit 26-1 (Frame 1 taken in Kerrville on September 20) to Exhibit 25-10 (taken in San Antonio) "clearly shows that the bumper and its attached cowling are in a different position from one photograph to another," which she claims supports Atwood's contention that the bumper was removed and reattached.

After reviewing the record, we conclude that the state court reasonably determined that Atwood's claim that Pima County investigators tampered with the San Antonio Suite was not credible. Atwood does not explain or support his contention that a "close dimensional analysis" proves that the

_____

[12] *See* Appendix, p. 63 (comparing Frame 26-1 from the Kerrville Suite with Frame 25-10 from the San Antonio Suite).

photographs in the San Antonio Suite were "[c]ounterfeit [a]dditions." Nor does the evidence substantiate Atwood's claim that a water-soluble paint was affixed to the bumper and then removed to enable false pre-scraping photos to be taken. Given Hill's lack of expertise, the state court reasonably discounted his affidavit regarding the existence of scrape marks beneath the surface of the paint, which are not visible in the photo. Although the Kerrville and San Antonio Suites show a change in the alignment of the bumper cowling, the change does not raise the inference that the bumpers were removed in San Antonio, transported to Tucson, transported back to San Antonio, and then reattached.[13]

C

Finally, we consider Atwood's claim that a series of unmarked and undated photos taken on the Pima County Sheriff's loading dock in Tucson (the Tucson Suite) shows investigators planting pink paint from Vicki's bicycle on the bumper of Atwood's car.

According to the undisputed facts, Vicki's bicycle remained in Tucson until law enforcement agents shipped it to the FBI laboratory in Washington, D.C., on September 25, 1984. The bicycle arrived at the FBI laboratory on September 26. Also on September 26, the FBI loaded Atwood's car into a trailer for transportation from the FBI's San Antonio impound garage to Tucson. The trailer arrived

---

[13] Larmour, the State's reconstruction expert, testified that the cowling was "a flexible portion in the bumper guard" that could readily fall out of alignment if a nut became loose or fell off. Larmour saw "no indication that [the bumper] was taken off and reattached."

in Tucson the next day, and the Pima County Sheriff's Department took custody of the car. In October 1984, the Pima Country Sheriff's Department sent the bumper of Atwood's car to the FBI. The bumper was returned to Tucson in March 1985, and Couser took photos of the bumper when it arrived in Tucson. (This set of photos is referred to as the Couser Suite.)

Atwood contends that an evaluation of the Tucson and Couser Suites establishes that the bumpers and the bicycle were together on the Pima County Sheriff's loading dock in Tucson before March 1985 and also shows that investigators planted the pink paint on the bumper of Atwood's car. To support this theory, Atwood points to one of the Tucson Suite photos showing a car's chrome bumper, and argues that the shiny surface of the bumper reflects a man holding a pink bicycle.[14] According to Atwood, this reflection establishes that the bicycle and the bumpers were together in Tucson at the same time. Although it is undisputed that the bicycle and bumper were together in Tucson in March 1985, Atwood argues that the Tucson Suite was taken earlier, because the bumper looks cleaner in the Couser Suite than in the Tucson Suite, indicating it had been cleaned in the FBI laboratory.[15] Next, Atwood argues that because Vicki's bicycle was shipped to Washington, D.C., on September 25, the Tucson Suite must have been taken before that date. Based on these assumptions, Atwood claims the Tucson Suite gives rise to the inference that investigators shipped the bumpers from

---

[14] *See* Appendix, pp. 64–68 (select Tucson Suite photos and an enhanced image that purportedly shows a pink bicycle).

[15] *Compare* Appendix, pp. 64–67 (Tucson Suite photos) with Appendix, p. 69 (Couser Suite photo).

Atwood's car to Tucson between September 22 and 25, 1984 to fabricate the pink paint evidence.

Atwood's claims are not credible in light of the record. Even with photographic enhancements, it is not possible to discern the reflection of a man holding a pink bicycle in the car's bumper. Moreover, the resolution, quality, lighting, and angles of the Tucson Suite and Couser Suite are substantially different, making it impossible to conclude that the bumper as photographed in the Couser Suite is cleaner than the bumper as photographed in the Tucson Suite. Because both inferences (the presence of the bicycle and the difference in the cleanliness of the bumpers) are necessary to support Atwood's theory that the Tucson Suite photos were taken before September 25, 1984, the state court could reasonably conclude that Atwood's allegations were not credible and a hearing would not have affected the court's determination.

D

The general implausibility of Atwood's theory further supports our conclusion that the state court was not unreasonable in declining to hold an evidentiary hearing. Under Atwood's theory, FBI agents colluded with Pima County investigators to remove and ship the bumpers to Tucson, insert staged photos, and mix paint samples to be sent to the FBI laboratory, despite the fact that Atwood's car already had a pink paint mark on the bumper. At the time of the alleged fabrication, law enforcement officers could reasonably expect the pink paint found on Atwood's car to match the paint on Vicki's bicycle and therefore would have had no incentive to plant additional pink paint on Atwood's bumper. Moreover, as the district court pointed out, there was no reason for the Pima County investigators, as part of a

clandestine operation, to take both bumpers to Tucson (when they needed only one for the alleged fabrication), to check these bulky items as baggage on a commercial airline, or to take photos of the bumpers during the fabrication process. Further, there does not seem to be any reason for the Pima County investigators to apply the pink paint to the bumper, scrape it off, mix the scrapings with scrapings of the other pink paint scraped from the bumper, and cover the scraped bumper with additional pink paint to cover the scrapings. Even more generally, at the time of this alleged misconduct, law enforcement authorities were in the midst of an investigation that might uncover further evidence. Indeed, the officers did not know at that time whether Vicki was alive or dead. Atwood's claim that at this point state and federal officers would have concocted an elaborate plot to fabricate evidence is simply not credible.

In sum, because Atwood's allegations regarding law enforcement misconduct are "incredible in light of the record," and a hearing would not have affected the state court's determination, the state court's failure to hold an evidentiary hearing was not unreasonable under § 2254(d)(2). *Perez*, 459 F.3d at 950.

E

As a subsidiary argument, Atwood also contends that the state court erred in not holding an evidentiary hearing on his claim that the State's accident reconstruction expert, Paul Larmour, fabricated evidence indicating that the markings and indentation on the car's gravel pan matched the pedal of Vicki's bicycle.

The record establishes that in September 1985, Larmour conducted an accident reconstruction to determine if physical evidence supported the State's theory that Atwood's car had run into Vicki's bicycle in Tucson. Larmour testified that the "marks on the car's gravel pan were consistent with the theory that it struck the bicycle at a low speed and caused the bike to lodge beneath the car." *Atwood*, 171 Ariz. at 595.

Atwood contends that the markings and indentation on the car's gravel pan did not exist at the time it was examined in San Antonio and must have been placed there during Larmour's accident reconstruction one year later.

Atwood's own evidence refutes this claim. Atwood points to photos taken before and after the reconstruction.[16] The "before" photos show scrapes and markings, as well as a slight indentation, on the gravel pan. The "after" photos arguably show more scrapes and markings and a slightly more prominent indentation. But such additional damage is consistent with Larmour having conducted an accident reconstruction. Because Atwood presents no evidence of fabrication of the "before" photos, which undisputedly show scrapings and indentation, the state court did not err in declining to conduct an evidentiary hearing on Atwood's law enforcement misconduct claim.[17]

---

[16] *Compare* Appendix, p. 70 (photos from before reconstruction) with Appendix, p. 71 (photo from after reconstruction).

[17] Atwood argues that the district court also erred in failing to conduct an evidentiary hearing on his fabrication claim. This argument is meritless; where AEDPA applies to a habeas petition, as it does here, a district court is limited to considering the state court record unless the petitioner satisfies the requirements of § 2254(d). *See Pinholster*, 563 U.S. at 185 n.7.

V

We next turn to Atwood's two ineffective assistance of counsel claims. The clearly established federal law for ineffective assistance of counsel claims is *Strickland v. Washington*, 466 U.S. 668 (1984). *See Pinholster*, 563 U.S. at 189. To establish ineffective assistance of counsel under *Strickland*, a petitioner must prove (1) that "counsel's performance was deficient," and (2) that "the deficient performance prejudiced the defense." 466 U.S. at 687.

Performance is deficient when counsel's representation falls "below an objective standard of reasonableness" and is therefore outside of "the range of competence demanded of attorneys in criminal cases." *Id.* at 687–88 (citation omitted). Counsel's performance can be deficient if counsel fails to conduct a sufficient investigation, but it is not deficient if counsel reasonably decides to limit the investigation. *Id.* at 690–91. Counsel may reasonably base investigation decisions on information supplied by the defendant. *Id.* at 691. We apply "a heavy measure of deference to counsel's judgments" regarding the scope of an investigation, *id.*, and presume "that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect," *Harrington v. Richter*, 562 U.S. 86, 109 (2011) (citation omitted) (internal quotation marks omitted). When evaluating counsel's choices, we must make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. "[C]ounsel should be strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable

professional judgment." *Pinholster*, 563 U.S. at 189 (citation omitted) (internal quotation marks omitted).

Counsel's deficient performance is prejudicial if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. More specifically, "[w]hen a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. And when a defendant challenges a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

"Under AEDPA, we do not apply the *Strickland* standard de novo." *Gulbrandson v. Ryan*, 738 F.3d 976, 988 (9th Cir. 2013). "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S. at 101. "The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Id.* at 105 (citations omitted) (internal quotation marks omitted).

A

We first consider Atwood's adipocere ineffective assistance of trial counsel claim. Atwood argues that Bloom rendered ineffective assistance of counsel by failing to develop information regarding the adipocere on Vicki's bones, which would have allowed Bloom to challenge the

State's chronology implicating Atwood in the murder. According to Atwood, the state habeas court's rejection of this claim was an unreasonable application of *Strickland*.

Under the State's theory of the case, Atwood murdered Vicki some time after 3:30 p.m. on the afternoon of September 17, 1984, dumped her body in the desert, and returned to De Anza Park approximately one hour before sunset. In explaining the presence of adipocere on Vicki's bones, Froede, one of the State's experts, testified that adipocere takes two to six months to develop and that the climatic records showed "a good deal of rain" in late September 1984 after Vicki's disappearance, which would have allowed the formation of adipocere on her bones.

Following his conviction, Atwood obtained the testimony of a new expert, Dr. Kris Lee Sperry, who reviewed the trial testimony and evidence from post-mortem examinations conducted in this case and concluded that the adipocere on Vicki's remains could be formed only if Vicki had been buried in the ground to a depth of at least one foot. Atwood argues that because it would have taken several hours to bury Vicki's body to that depth in the hard desert soil, he would not have had time to dig a grave and return to De Anza Park approximately an hour before sunset. Had Bloom investigated the adipocere issue and found evidence of burial of the remains, Atwood contends, it would have undermined the State's timeline. Therefore, Atwood's petition to the state court argued that Bloom's "[f]ailure to discover the existence of the grave amounted to ineffective assistance of counsel."

The state court rejected this argument, holding that Atwood did not carry "his burden of proving that there ever was a grave" and therefore "the factual predicate for this

claim of failure on the part of Mr. Bloom to discover a grave also fails." The court also rejected Sperry's testimony as contrary to the facts of the case and inconsistent with credible sources. The opinion states:

> In drawing the conclusion that the victim's body must have been buried (because of the existence of adipocere) and that the skeletal remains must have been later exhumed by a human, Dr. Sperry's opinion fails to consider the known evidence, such as the weather conditions recorded at the weather station closest to the site where the remains were found, the absence of tool marks on the skeletal remains, and the absence of dirt imbedded in the openings of the bones and skull.

Further, the court found that Sperry's opinion was contrary to the published articles of other experts. The court concluded that "[b]ecause the factual basis for his opinion is contradicted by other credible sources, the probative value of Dr. Sperry's opinion is minimal" and that Atwood "failed to show that Dr. Sperry's opinion evidence probably would have changed the jury's verdict."

We review Atwood's adipocere ineffective assistance of counsel claim "[u]nder the doubly deferential judicial review that applies to a *Strickland* claim evaluated under the § 2254(d)(1) standard," *Mirzayance*, 556 U.S. at 123, and hold that the state court reasonably applied both the deficiency and prejudice prongs of *Strickland*.

First, the state court reasonably applied *Strickland* in holding that Bloom's performance was not deficient. Bloom had "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. The state court could reasonably conclude that Bloom fulfilled these duties. Prior to trial, Bloom reviewed the report written by Keen, one of the two experts hired by Couser. He also hired four additional experts, and questioned both of the State's experts about adipocere. None of the numerous pathologists and anthropologists who examined the remains before trial indicated that burial was a precondition to adipocere formation. In an interview at the state medical examiner's office, the State's experts told Bloom and the prosecutor that there was "no indication of burial." Under the "heavy measure of deference" afforded to counsel's judgments under *Strickland*, the state court could reasonably conclude that Bloom made a reasonable decision not to further investigate a burial theory. *See Strickland*, 466 U.S. at 691; *see also Wiggins v. Smith*, 539 U.S. 510, 533 (2003) (holding that "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence" or every possible defense).

The state court could also have concluded that Bloom adopted a reasonable defense strategy at trial by seeking to discredit the use of adipocere by Froede and Birkby to estimate Vicki's time of death. Bloom succeeded in eliciting testimony from the State's experts that adipocere cannot be used in isolation to develop a precise timeline for the decomposition of remains. Moreover, the State's experts conceded that the remains could have been deposited in the desert as late as February 1985 or as early as April 1984. In closing argument, Bloom relied on these concessions to argue

that "maybe [Vicki] didn't die right out there at that time," and to suggest that she could have died at a later date or her body could have been placed in the desert at a later date. Given the deference to counsel's judgment and strategy required by *Strickland*, the state court did not unreasonably apply *Strickland* in concluding that Bloom adopted a reasonable strategy with respect to the adipocere evidence.

Second, the state court reasonably applied *Strickland* in holding that Bloom's allegedly deficient performance was not prejudicial. Given the "totality of the evidence" before the jury and the disputed nature of the potential testimony, the state court could reasonably have determined that there was no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694–95. The state court could have reasonably determined that Atwood's theory that Vicki's body had been buried was not strong, given that the State and defense experts who examined the bones found no indications of burial and that Sperry's opinion failed to rely on known evidence and was contradicted by credible sources.[18] Conversely, the jury heard significant evidence linking Atwood to the crime. The jury heard testimony that Atwood's car was seen at Vicki's school the day of her disappearance, *Atwood*, 171 Ariz. at 592–93; Atwood was seen driving a Datsun in Vicki's neighborhood before she disappeared, *id.* at 593; and Atwood was seen leaving Vicki's neighborhood with a small child in his car, *id.* at 595.

---

[18] In his reply brief, Atwood argues that the State's experts would have testified that burial was a necessary precondition to the formation of adipocere and that Vicki must have been buried. This argument is meritless. The State's experts stated shortly before trial, and after trial, that burial was not a necessary precondition to the formation of adipocere.

Testimony also placed Atwood in the vicinity of the site where Vicki's remains were found, *id.*, and witnesses testified that they saw Atwood with a knife and with blood on his hands and clothes on the afternoon of Vicki's disappearance, *id.* at 596. The jury also heard evidence that Atwood had admitted he was attracted to children and had told Bernsienne that the next time he picked up a child, he would make sure that the child did not talk. *Id.* Finally, physical evidence linked Atwood's car to Vicki's bicycle. *Id.* at 595.[19] Given the weakness of the evidence supporting Atwood's adipocere claim and the strength of the evidence against Atwood, the state court reasonably found that any deficient performance by Bloom did not give rise to a "reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695.[20]

---

[19] On appeal, Atwood contends that a court should not consider the physical evidence linking Atwood to Vicki's bicycle because it was a product of law enforcement misconduct. As we have already indicated, the state court did not err in concluding that the law enforcement misconduct claim was not credible.

[20] Atwood states that "[t]he state court's decision was an unreasonable determination of facts," but does not develop this argument; therefore, it is waived. *Christian Legal Soc. Chapter of Univ. of Cal. v. Wu*, 626 F.3d 483, 487 (9th Cir. 2010) (per curiam). In any event, the state court was not required to hold an evidentiary hearing because "the record refutes [Atwood's] factual allegations or otherwise precludes habeas relief." *Hibbler*, 693 F.3d at 1148 (quoting *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007)).

Atwood also argues that the district court erred in failing to conduct an evidentiary hearing to resolve disputed issues of fact. Again, this argument fails under *Pinholster*, 563 U.S. at 185 n.7.

B

We now turn to Atwood's ineffective assistance of sentencing counsel claim. Atwood argues that Bloom rendered ineffective assistance by failing to present evidence from mental health experts regarding Atwood's drug abuse and the traumatic effects of his childhood molestation. Atwood acknowledges that he failed to raise this claim to the state court, and that it is procedurally defaulted. Nevertheless, Atwood argues that he has met the requirements set forth in *Martinez v. Ryan*, 566 U.S. at 9–10, to overcome the procedural default. Atwood asserts that the district court erred in rejecting this argument.

"Federal review is generally not available for a state prisoner's claims when those claims have been denied pursuant to an independent and adequate state procedural rule." *Clabourne v. Ryan*, 745 F.3d 362, 375 (9th Cir. 2014), *overruled in part on other grounds*, *McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015) (en banc). A state prisoner may be able to obtain federal habeas review of a procedurally defaulted claim if "the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). "An attorney error does not qualify as 'cause' to excuse a procedural default unless the error amounted to constitutionally ineffective assistance of counsel." *Davila v. Davis*, 137 S. Ct. 2058, 2062 (2017). "Because a prisoner does not have a constitutional right to counsel in state postconviction proceedings," as a general rule "ineffective assistance in those proceedings does not qualify as cause to excuse a procedural default." *Id.* (citing *Coleman*, 501 U.S. 722).

The Supreme Court has created a "narrow, equitable . . . qualification" of this rule. *Id.* at 2065 (alteration in original) (citation omitted) (internal quotation marks omitted). Where a prisoner fails to raise an ineffective assistance of trial counsel claim in state court, "a procedural default will not bar a federal habeas court from hearing a *substantial* claim of ineffective assistance at trial" if (1) "state law requires prisoners to raise claims of ineffective assistance of trial counsel in an initial-review collateral proceeding," *id.* (emphasis added) (citation omitted) (internal quotation marks omitted), and (2) "the default results from the ineffective assistance of the prisoner's counsel in the collateral proceeding," *id.*[21] A claim of ineffective assistance of trial counsel is "substantial" if the prisoner demonstrates that "the claim has some merit." *Martinez v. Ryan*, 566 U.S. at 14.

In evaluating whether the failure to raise a substantial claim of ineffective assistance of trial counsel in state court

---

[21] *Trevino v. Thaler* described this narrow exception as allowing a federal habeas court to find "*cause* to excuse [a defendant's] procedural default," 133 S. Ct. 1911, 1917 (2013) (emphasis added) (citation omitted), but did not indicate whether the federal habeas court was also required to find "actual prejudice as a result of the alleged constitutional violations" in order to overcome the procedural default, *Coleman*, 501 U.S. at 745. We subsequently held that under *Martinez v. Ryan*, a prisoner satisfies the prejudice prong of the "cause and prejudice" standard for overcoming a procedural default when the prisoner's claim of trial-level ineffective assistance of counsel claim is substantial. *See Detrich v. Ryan*, 740 F.3d 1237, 1245–46, 1261 (9th Cir. 2013) (en banc); *see also Clabourne*, 745 F.3d at 377 (interpreting *Detrich* as reaching this conclusion based on the agreement of nine of the eleven judges in separate opinions). This analysis is consistent with *Davila*, which provides that "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial" if the "cause" prong set forth in *Trevino* is satisfied. *Davila*, 137 S. Ct. at 2065 (citation omitted).

resulted from ineffective assistance of *state habeas* counsel under *Strickland*, we must evaluate the strength of the prisoner's underlying ineffective assistance of *trial* counsel claim. If the ineffective assistance of trial counsel claim lacks merit, then the state habeas counsel would not have been deficient for failing to raise it. Further, any deficient performance by state habeas counsel would not have been prejudicial, because there would not be a reasonable probability that the result of the post-conviction proceedings would have been different if the meritless claim had been raised. *Clabourne*, 745 F.3d at 377 ("The reasonable probability that the result of the post-conviction proceedings would have been different, absent deficient performance by post-conviction counsel, is necessarily connected to the strength of the argument that trial counsel's assistance was ineffective.").[22]

Here, Arizona law required Atwood to raise his claim of ineffective assistance of trial counsel in a collateral proceeding. *Martinez v. Ryan*, 566 U.S. at 4. Because the "initial review in a collateral proceeding" requirement of *Martinez v. Ryan* is met, we consider the merits of Atwood's claim of ineffective assistance of trial counsel at sentencing in order to determine whether this claim is substantial and whether the failure of his post-conviction counsel (Daniel Davis) to raise this claim in state habeas court constituted constitutionally ineffective assistance.

---

[22] Even if a court determines that a defendant has shown cause and prejudice sufficient to overcome a procedural default, that determination "does not entitle the prisoner to habeas relief." *Martinez v. Ryan*, 566 U.S. at 17. Rather, it allows a federal court to consider de novo "the merits of a claim that otherwise would have been procedurally defaulted." *Id.*; *see also Dickens v. Ryan*, 740 F.3d 1302, 1321 (9th Cir. 2014) (en banc).

We first consider whether Bloom's representation at sentencing was deficient because he failed to sufficiently investigate and present evidence regarding Atwood's mental health. Atwood argues that had Bloom obtained professionals to look into Atwood's background and mental health, Bloom could have presented powerful mitigating evidence that Atwood suffered from a trauma-related mental impairment, such as post-traumatic stress disorder (PTSD), which developed after Atwood was molested at the age of fourteen by a twenty-four-year-old. Atwood contends that his childhood molestation initiated a downward spiral, skewing his sexual development and causing him to engage in disruptive behavior.

The district court conducted a four-day evidentiary hearing on this issue. The records from Atwood's three-year incarceration at the Atascadero State Hospital were submitted to the district court as part of this hearing. Psychological reports in these records diagnosed Atwood with pedophilia. The records contained further details of Atwood's sexual offenses against minors. Among other items in the records, a report included Atwood's statement that a four-year-old girl that he molested "deserved it" because she was the block "tattletail." Atwood also stated that he molested the ten-year-old girl because he felt like "scaring someone." The records documented Atwood's aggressive pre-incarceration behavior, describing an incident in which Atwood threatened his mother "with a butcher knife and generally terroriz[ed] the family," and another incident in which Atwood threatened his cousin with a knife. While at Atascadero, Atwood was uncooperative and deemed "basically unamenable to treatment." A staff report noted that Atwood "kn[ew] the proper words to use in therapy," but did not make actual progress. Finally, the records contained details of Atwood's

threatening and antisocial behavior at the hospital, describing multiple incidents in which Atwood verbally and physically assaulted patients and staff.

The district court also heard testimony from Bloom regarding the scope of his investigation. Bloom stated that he met with Atwood, consulted with Atwood's parents, and reviewed Atwood's Atascadero records.[23] Bloom testified that after reviewing the records from Atascadero, he decided that introducing the records would be "going down a wrong path," because they could be used to support the State's theory that Atwood "was predisposed to committing these kind of offenses and that it may have been premeditated conduct." Moreover, it might lead the prosecutor to highlight damaging evidence regarding Atwood's prior sexual molestation convictions.

Bloom also testified that he "[t]hought about [retaining a mental health expert] but decided not to" for a number of reasons. Most important, nothing in Bloom's research or his personal observations of Atwood suggested that such an inquiry would have provided helpful mitigation evidence. The Atascadero records showed that multiple social workers, psychiatrists, and psychologists had interviewed Atwood or considered his case, and none of these professionals indicated that Atwood had any significant mental impairment or disease. Nor did Atwood himself display symptoms of trauma. According to Bloom, Atwood did not take being molested by the twenty-four-year-old "very seriously" (he had told Bernsienne that he enjoyed the experience), and he did not appear traumatized by it. Atwood's parents believed

---

[23] Bloom was assisted by his paralegal, who performed the functions of a mitigation specialist.

that drugs caused Atwood's problems and that Atwood did not have any mental impairment.  Bloom was also concerned that the State would obtain a rebuttal mental health expert that could provide damaging testimony about Atwood.[24]

Finally, Bloom testified that Atwood was opposed to a mental impairment theory: Atwood "did not want [Bloom] to bring in anything about his mental problems or anything about his sexual past," and indicated "that he was not going to cooperate."[25]   Given these considerations, and after discussing the issue with Atwood, Bloom concluded that the best strategic decision was to limit the prejudicial evidence

---

[24] Bloom testified that he reached an agreement with the prosecutor about the evidence to be introduced at sentencing.  Under the alleged agreement, Bloom would not open the door to Atwood's mental state if the prosecutor would not seek admission of the Atascadero records or offer testimony from Atascadero personnel concerning Atwood's behavior.  The prosecutor initially agreed with Bloom's recollection of this agreement, but later concluded that there must not have been an agreement after reviewing the transcript of his cross-examination, which referenced Atascadero records.

[25] Atwood denied making these statements, and claimed that he requested a mental evaluation.  However, the district court found Atwood's testimony on this issue was not credible.  The district court found "that Bloom was a highly credible witness and credit[ed] fully his testimony that petitioner did not want to be examined.  The Court also [found] credible Bloom's assertion that he contemplated a mental health exam but feared [Atwood] . . . would not cooperate."  "Because the district judge is able to hear testimony live and to view the witnesses as they testify, his credibility findings are entitled to deference on appeal." *United States v. Mejia*, 69 F.3d 309, 315 (9th Cir. 1995); *see also Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985) ("[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.").

considered by the sentencing judge and develop mitigating evidence on Atwood's drug use and family background, rather than develop a mental impairment defense.

The four-day evidentiary hearing also included the testimony of mental health professionals who evaluated Atwood for purposes of the hearing. Atwood presented testimony from Dr. Donna Schwartz-Watts, a psychiatrist who evaluated Atwood in October 2012. At the evidentiary hearing, Schwartz-Watts testified that Atwood currently exhibited many of the symptoms of PTSD, but that she could not determine whether Atwood developed PTSD when he was molested at the age of fourteen or in response to other adverse events, such as his experiences in prison. Schwartz-Watts conceded that the Atascadero records did not report that Atwood had been traumatized. She also conceded that the records documented a pattern of behavior consistent with antisocial personality disorder, and stated, "it's very fair to say a lot of [Atwood's] actions [once he was confined] were sociopathic. They were to get something he wanted. They were to manipulate." Schwartz-Watts also testified that Atwood "technically meets the criteria" for pedophilia.

The State presented expert testimony from Dr. Erin Nelson, a psychologist who conducted a mental health evaluation of Atwood in June 2013. Nelson testified that she had diagnosed Atwood with substance abuse disorder, pedophilic disorder, and antisocial personality disorder. She stated that there was a "plausible argument" that Atwood satisfied the criteria of PTSD "as we sit here today," but that PTSD was "not evident at the time of [Atwood's] arrest or when he was first incarcerated." Nelson concluded that "a large amount of the evidence" indicated that Atwood may have developed PTSD "post incarceration," pointing out that

the Atascadero records contained no discussion of trauma, and that Atwood bragged about his ability to manipulate psychologists. Nelson also stated that, regardless of whether Atwood had PTSD or antisocial personality disorder, he was able to control his behavior pre- and post-offense.

On January 27, 2014, after reviewing the evidence presented at the evidentiary hearing, the district court held that Atwood's claim of ineffective assistance of counsel at sentencing was meritless and that therefore Atwood failed to satisfy the requirements of *Martinez v. Ryan* to excuse procedural default. The court denied Atwood's motion for reconsideration.[26]

Based on this record, we agree with the district court that Atwood's claim of ineffective assistance of sentencing counsel lacked merit. First, Bloom's failure to conduct further investigation into Atwood's mental health did not fall below an objective standard of reasonableness. Bloom could have reasonably determined that further investigation of Atwood's background and mental state would not have provided useful support for the mitigation theory that Atwood suffered from a mental impairment. *See Gonzalez v.*

---

[26] The court also denied Atwood's motion on the ground that Atwood had raised a new claim for ineffective assistance of counsel in his motion for reconsideration that was not raised in his federal habeas petition and that leave to amend his petition would be futile because the new claim was barred by AEDPA's one-year statute of limitations in 28 U.S.C. § 2244(d)(1). *See supra* at 18. We need not address whether Atwood presents a claim that was not raised in his federal habeas petition or whether the district court abused its discretion in denying leave to amend. Even assuming that Atwood properly raised his claim, we agree with the district court's alternative holdings that Atwood's claim fails to satisfy the requirements of *Martinez v. Ryan* and fails on the merits.

*Knowles*, 515 F.3d 1006, 1015 (9th Cir. 2008) ("Absent any objective indication that [Petitioner] suffered from any mental illness, [counsel] cannot be deemed ineffective for failing to pursue this avenue of mitigation . . . ."). As Bloom testified, the evidence available to him at the time did not indicate that Atwood was traumatized; neither the Atascadero records, nor Bloom's own observations of Atwood, nor interviews with Atwood's parents supported such a theory. Moreover, Atwood did not want Bloom to pursue this form of mitigation and indicated that he would not cooperate with a mental health examination. *Strickland*, 466 U.S. at 691 ("[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.").

Bloom's "decision to present a limited defense to restrict the prosecution's rebuttal evidence was a legitimate strategy." *Elmore v. Sinclair*, 799 F.3d 1238, 1251 (9th Cir. 2015). We have held that counsel's decision not to pursue a mental health defense is a reasonable strategic decision under *Strickland* where it avoided the introduction of "dueling mental health experts," evidence of the petitioner's "past acts of sexual abuse as rebuttal evidence," and "details of the crime." *Id.* at 1246, 1251; *see also Wong v. Belmontes*, 558 U.S. 15, 25 (2009) (per curiam) (recognizing that "[a] heavyhanded case to portray [the defendant] in a positive light, with or without experts, would have invited" strong evidence in rebuttal and stating that counsel had "a lot to lose" by taking a "more-evidence-is-better" approach). Bloom could have reasonably concluded that adopting a mental health defense would open the door to rebuttal testimony that Atwood has pedophilic disorder and antisocial personality disorder. As we have noted, evidence of an

antisocial personality disorder may be highly damaging. *Beardslee v. Woodford*, 358 F.3d 560, 583 (9th Cir. 2004) (acknowledging that an antisocial personality diagnosis can be damaging and noting that we assume that competent counsel regularly evaluate the potential impact of psychiatric testimony); *Clabourne v. Lewis*, 64 F.3d 1373, 1384 (9th Cir. 1995) (noting that records showing the defendant had an antisocial personality were not helpful); *Crittenden v. Ayers*, 624 F.3d 943, 968 n.15 (9th Cir. 2010) (holding that counsel made a reasonable decision to keep evidence of a defendant's antisocial personality disorder away from sentencing jury). In addition, adopting a mental health defense could open the door to damaging information from the Atascadero records, including details of Atwood's prior offenses, reports that Atwood was unamenable to treatment, and descriptions of Atwood's threatening and antisocial behavior at Atascadero. Given the detrimental rebuttal evidence that could have been introduced, Bloom reasonably focused his efforts on developing other areas of mitigation, such as Atwood's drug use and his good family background.[27] Accordingly, Bloom's strategic decision not to pursue a mental health investigation

---

[27] Atwood suggests that Bloom rendered ineffective assistance of counsel by failing to investigate and introduce further corroborating evidence regarding Atwood's drug use. We disagree, because any such evidence would have been merely cumulative. Atwood and his father both testified during the mitigation hearing about his extensive drug use. Producing additional documentation to support this testimony would have been redundant and "would have offered an insignificant benefit, if any at all." *Belmontes*, 558 U.S. at 23; *cf. Bland v. Sirmons*, 459 F.3d 999, 1031 (10th Cir. 2006) (finding no prejudice when counsel failed to present additional, redundant testimony about defendant's drug use). Accordingly, the failure to introduce such evidence was neither deficient nor prejudicial.

appears to be a reasonable choice given the totality of the circumstances. *Strickland*, 466 U.S. at 695–96.

Atwood argues that even if Bloom could have reasonably decided not to pursue a PTSD theory, a mental health expert might have come up with some other useful theory, and there would have been no harm in hiring such an expert. But the Supreme Court's precedent does not support the theory that if counsel had "nothing to lose" by pursuing a defense, then counsel is deficient for failing to pursue it. *Cf. Mirzayance*, 556 U.S. at 122. "[T]he relevant inquiry under *Strickland* is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable." *Siripongs v. Calderon*, 133 F.3d 732, 736 (9th Cir. 1998). An argument that counsel could have relied on "any number of hypothetical experts . . . whose insight might possibly have been useful" is speculative and insufficient to establish that counsel was deficient. *Richter*, 562 U.S. at 107.

In sum, Atwood fails to present evidence that Bloom's performance was outside "the range of competence demanded of attorneys in criminal cases" under the "prevailing professional norms" in Arizona in 1987. *Strickland*, 466 U.S. at 687–88 (citation omitted); *see also Pinholster*, 563 U.S. at 196 (rejecting the dissent's argument that counsel's performance was deficient where the dissent provided no evidence that counsel's chosen mitigation strategy was "inconsistent with the standard of professional competence in capital cases that prevailed in Los Angeles in 1984"). This is "a case, like *Strickland* itself, in which defense counsel's decision not to seek more mitigating evidence from the defendant's background than was already in hand fell well within the range of professionally reasonable judgments." *Bobby v. Van Hook*, 558 U.S. 4, 11–12 (2009) (per curiam)

(citation omitted) (internal quotation marks omitted). Accordingly, we hold that Bloom's representation was not deficient under the deferential standard set out in *Strickland*.

Second, even if Bloom's performance had been deficient, Atwood could not establish that this deficiency "prejudiced the defense." *Strickland*, 466 U.S. at 687. Atwood argues that if Bloom had investigated his mental health, there is a reasonable probability that the sentencer "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695. We disagree. As noted above, nothing in the Atascadero records indicated that Atwood suffered trauma-related symptoms, and Atwood's own expert admitted that she could not determine when Atwood might have developed his alleged trauma-related impairment. Speculation that Atwood may have some type of brain dysfunction or disorder "is not sufficient to establish prejudice." *Bible v. Ryan*, 571 F.3d 860, 871 (9th Cir. 2009). Moreover, even if such evidence could have been presented, it may well have opened the door to the damaging rebuttal evidence described above. Therefore, taking into account "the totality of the evidence," we hold that Atwood failed to establish "a reasonable probability that, but for [sentencing] counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694–95.

Because Atwood's claim of ineffective assistance of sentencing counsel claim lacks merit, Davis, Atwood's post-conviction counsel, was not deficient for failing to raise it. Further, Davis's failure to raise the meritless ineffective assistance of sentencing counsel claim was not prejudicial, because there was not a reasonable probability that the state habeas court would have granted Atwood relief had Davis

raised it.  Therefore, Atwood cannot meet *Martinez v. Ryan*'s standard for excusing his procedural default in failing to bring this claim before the state habeas court.  *See Davila*, 137 S. Ct. at 2065.  Accordingly, Atwood's ineffective assistance of sentencing counsel claim is procedurally barred.  *Coleman*, 501 U.S. at 745.**[28]**

**AFFIRMED**.

---

**[28]** Because we have concluded that Atwood's claim of ineffective assistance of sentencing counsel is meritless, *see supra* at 51–55, Atwood would not be entitled to relief even if his claim were not procedurally barred.  *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

**APPENDIX**

*Photographs from Kerrville Suite*

Kerrville Photo Suite Court Record Exhibits 26 & 27[*]



KPS Frame 01          KPS Frame 02



KPS Frame 03          KPS Frame 04

---

[*] Frame Numbers assigned in accordance with the Kerrville Photo Log sequence

*Photographs from Kerrville Suite (cont'd)*





KPS Frame 05                    KPS Frame 06





KPS Frame 07                    KPS Frame 08

*Photographs from Kerrville Suite (cont'd)*



KPS Frame 09            KPS Frame 10



KPS Frame 11            KPS Frame 12

*Frame 9 of Kerrville Suite (Top)
and Frame 1 of Kerrville Suite (Bottom)*





*San Antonio Suite—Alleged Counterfeit Additions*



Exhibit 25-32



Exhibit 25-33



Exhibit 25-34



Exhibit 25-35



*Photograph Comparing*
*Exhibit 25-10 (left—San Antonio Suite) and Exhibit 26-1 (right—Kerrville Suite)*

*Photographs from Tucson Suite*



TSUNK001



TSUNK002



TSUNK003

*Photographs from Tucson Suite (cont'd)*



TSUNK004



TSUNK005



*Photograph from Tucson Suite*

*Photograph from Tucson Suite*

*Enhanced Image from Photograph in Tucson Suite*



*Photograph from Couser Suite*



*Photographs of Gravel Pan in San Antonio*
*Before Accident Reconstruction*





*Photograph of Gravel Pan After Accident Reconstruction*

